Good morning. May it please the Court. My name is Don Springmeyer. I'm the lead counsel for the appellant state tax collecting authorities in these consolidated appeals. It isn't often in my career that it's been appropriate to hark back to Alexander Hamilton, but this is one such occasion. A law for abrogating or preventing the collection of a tax laid by the authority of the states would not be the supreme law of the land but a usurpation of the power not granted by the Constitution. Those are the words from Alexander Hamilton in Federalist No. 33, and there was not really a more staunch advocate of central federal power at that time than Hamilton. The counties are here today asking you to serve the critical constitutional function of structural referee. That is the phrase I think coined by Judge Wilkinson in his concurring opinion in Prozoncola v. Virginia Polytech. Because even after the court's en banc Prozoncola opinion and the Supreme Court's affirmance and expansion of that in Morrison, we are back with an even more fundamental conflict for you today between the two sovereigns. Can Congress shield these two private corporations from a state real-estate transfer tax which has nothing to do with interstate commerce? The state real-estate transfer tax, Your Honor. It is imposed when a party carries a deed to the county register of deeds office to transfer a title, and it is imposed as a percentage of the value of the transaction. The money is delivered to the county register. Well, that's an argument to make, but it doesn't advance much because it's imposed here on a federally-created corporation that was created targeting the national economy and with specific economic purposes. In doing that, Congress created exemptions, and the question is whether the exemptions are broad enough to exempt the transfer tax or eliminate real estate includes, the exemption includes transfer tax. The second question would be whether Congress has a constitutional authority, but I don't know which one you want to address first, but it would be more helpful to get in the context of this case which I don't think many people could dispute that Fannie Mae and Freddie Mac were exercises of the commerce power, well within the commerce power. They were targeting the national economy with the national economic purposes, and they created the authority that created those corporations. That is true originally, Your Honor. It is the conversion of those corporations to the national economy. That is true originally, Your Honor. But Congress created the exemptions, and we have to construe the exemptions, right? Correct. And then we have to decide whether Congress had the power to do it. Yes. You can reverse the order if you want, ask whether Congress had the power to do it, but it doesn't help us to try to reason from platitudes. Why don't we focus on one of those two issues, either did Congress exempt the transfer tax and the statutory exemption, and did Congress have the power to do it? Aren't those the two questions? Those are the two questions, Your Honor. And I think, Your Honor, in your concurrence in Brazancala, you went to the core of this question, which is what the Supreme Court in Lopez called the but-for problem. Is it possible to say that any flutter of the butterfly's wings affects interstate commerce? But Lopez didn't involve economic regulation, did it? I mean, surely, well, is it your position that secondary mortgage transactions aren't activities that substantially affect interstate commerce? No, Your Honor, that's not my position. I agree that those do affect interstate commerce. The question here is, does the purported exemption of the real estate transfer tax have really anything to do with the secondary mortgage market? That's really what the but-for question is. Well, doesn't it reduce these corporations' expenses in carrying out its mission? Certainly. It affects their profit. It's part of their overhead. And it seems to me the question becomes, can Congress, in creating these corporations, carrying out the missions, streamline their activities such that we're going to relieve them of the burden of A, B, C, and D in order to better carry out the mission? But, Your Honor, the question of where you draw the line then comes into play. If Congress can say that for these corporations, what is the outer boundary? What is the limit, which is another? The Commerce Clause is the limit. Correct, but the limit of the Commerce Clause, as applied to a state tax, is a place where we don't have a rule from this court or... They're not attacking the tax. They're saying that these corporations are going to be exempt from tax. That's true. And it's the application of that exemption. I mean, for example, suppose Congress were to say, we're exempting Walmart from having to pay real property taxes, ad valorem taxes. Is that a proper exercise of the Commerce Clause? I'd suggest no, but where do we draw the line from there to this? I suggest this also falls on the wrong side of any possible outer limit of the Commerce Clause. Do I understand you to say that you don't have any problem with Congress's ability under the Commerce Clause to create Fannie Mae and Freddie Mac as private corporations? No, I have no problem with... And do you have any problem with the general exemptions from taxation? If these entities were still federal instrumentalities that... They were created by it, and they're carrying out a very important federal mission. The policy, as we've all now come to know in recent years, was a policy of advancing home ownership, enabling people to buy with these federal guarantees, and encouraging that policy. And it was very important to the economy. I agree with that, Your Honor. And so the question is, in creating this statutory structure, which included creating the corporations and identifying their mission and giving them power, could Congress exempt them from taxation, period? Yes. So your problem is with the scope of the exemption? It is with the conversion of those corporations to private corporations, and whether that tax exemption can still be correctly and properly applied under Congress's power, under the Commerce Clause. But Congress has routinely exempted entities that are not purely federal from congressional taxation within the authority of the Commerce Clause. So I'm not quite sure what your argument is going to... It would help me if you would structure your argument along the lines of the two questions. First of all, does Congress have the power to do this? And I think that's where you are now. Am I correct? And then whether or not the real estate exemption subsumes the transfer taxes. Your Honor, the occasions when Congress has correctly interposed its power on state taxation have been occasions of state discriminatory taxation. Many of those under the Dormant Commerce Clause. But take, for example, the cases of the railroad cars in Department of Indian Reservations or Arizona Public Service Commission where you had the tax on electricity generated in the Four Corners power plants. In each of those cases, it was the discriminatory aspect of the tax which was found by the Supreme Court to give Congress the power to interpose itself and prevent that taxation. We have no example that I can find of a state tax which has been barred under Congress's commerce power interfering with the sovereignty which is not discriminatory. Well, are you aware of, can you cite any Supreme Court decisions that have not upheld Congress's ability to abrogate states' taxation policies through federal legislation? Your Honor, that is something we do not have. I do not have and we do not have. We don't have a precedent for this exact situation where you have a state, non-discriminatory, entirely local tax which has been either upheld or stricken down in a Supreme Court opinion. I agree with that. The question of the effect on interstate commerce is an important one and I'm trying to come profit or overhead of an entity which is operating in interstate commerce. Can that be characterized as a interference or a substantial effect on interstate commerce? You don't have a great deal of time. Do you want to talk at all about transfer taxes as being encompassed within the exemption? Yes, Your Honor. The second part of the statutes that we are talking about saves the taxes applied by state and local authorities to real property and says to the same extent as is otherwise taxed. We argue that the tax applied when you sell that property, the transfer tax, is like a piece of that ownership, that real estate title bundle of sticks as we've cited in our briefs, which should bring it within the exception to the exemption. When we say real property is taxed, that this tax is exempt to the extent that real property is taxed, do we say that real property is being taxed when we tax its transfer? I mean, it's a little bit like the personal property tax. In some states, they tax boats where just the ownership is being taxed or the sales tax when you sell the vehicle. There's a difference between the two. And here, the transfer tax is taxing the transaction that transfers title. But do we say that that's a tax on the real estate? I thought the Supreme Court sort of made that distinction in the Wells Fargo case, pointed out that one's an excise tax and the other's a tax on real property. Your Honor, if you think of the ability to sell the property, the ability to alienate the title. Well, it doesn't affect the ability. True. What it does, it says when you enter into a transaction, we're going to tax the transaction. Yes, and it's taxed in exactly the same way that an ad valorem tax is applied. It is a certain percentage of the value of the real property. And that is what I suggest. It could be anything, but the point is that they could just have a blanket fee for the transfer. When you buy an item at Wal-Mart in Maryland, you pay 6% tax. Yes. And that tax is on the transfer of the item to the seller or a sales tax for making the sale. Well, I think it's correct that it is a sales tax on making the sale. Isn't the transfer tax a sales tax? I don't think so, Your Honor. It can attach, and in many states it attaches either to the buyer or the seller, and it is a method by the state of collecting revenue that is exactly like the ad valorem tax. And it's part of that same collection of rights that in total we call real estate, real property. Is it a direct tax in your view? Yes. Is it paid attendant to the ownership of the property? If I own property and don't sell it, will I ever be exposed to the transfer tax? No. It only attaches upon a transfer. How do you handle the Wells Fargo language which makes the distinction between a tax on property and a tax on the property's transfer? They call one an excise tax and the other a tax on the property. Your Honor, for my purposes that's the alternative argument. If it is an excise tax, then the exemption is improper. If it is a direct tax, then the exception to the exemption should apply. So I don't argue them as being coextensive, but rather in the alternative. All right, Mr. Springmeyer, I believe you're out of time for your initial argument. Let's hear from Mr. Johnson. You've got some time reserved. Thank you, Your Honors. May it please the Court, I'm Michael Johnson from Arlington Porter. I represent the Federal Housing Finance Agency, which is the conservator of Fannie Mae and Freddie Mac. I'm arguing on behalf of all the appellees this morning. I wanted to start with what we call the carve-out argument. Mr. Springmeyer called it the exception to the exemption. I like to call it appellants' kind of, sort of, close enough argument because what they're arguing is this tax is kind of, sort of, close enough to the property tax that the statute accepts that it ought to be treated as if it were in the carve-out. I think many of the questions were directly on point here. Wells Fargo and other like cases control this situation. Wells Fargo involved a virtually identical tax, federal estate tax triggered by a conveyance of certain property. The property was statutorily exempt from all taxation. So the Supreme Court had to decide, is a conveyance tax a tax on the property? If conveyance taxes, transfer taxes, sales taxes, all these transaction-triggered excise taxes were kind of, sort of, close enough to taxes on the underlying property that they ought to be treated as such, the Wells Fargo decision would have had to come out the other way. Had to come out the other way. Wells Fargo isn't the only decision like that. United States versus City of Detroit. Here's what happened in that case. The United States government owned a warehouse. Decided to lease the warehouse to a commercial enterprise that wanted to use it for a purely commercial purpose. Not a government contract. Nothing governmental about the use at all. So the real estate is exempt from taxation. The state of Michigan thinks to itself, we want our property tax. But the property is exempt. So it enacted an excise tax on the use of the property. And it designed the excise tax to work exactly like the property tax. If we sat down today and tried to come up with an excise tax that was kind of, sort of, close enough to a property tax, we couldn't do better than the state of Michigan did in the Detroit case because that tax worked exactly like the underlying property tax. Government property was exempt. Supreme Court had to decide, is this excise tax kind of, sort of, close enough to a property tax that the exemption ought to apply? Answer, no. It's an excise tax. It's not a property tax. And so it's not kind of, sort of, close enough to be treated like a property tax. We discussed the Pittman case in our brief. The Pittman case is very important because it involves the application of an exemption statute that has virtually the identical carve out. The tax that issue in that case was a tax on the recordation of mortgages. Now we all know from first year of law school a mortgage is an interest in real estate. It is an interest in real estate. So if a tax imposed on the recordation of an interest in real estate was kind of, sort of, close enough to a tax on the underlying property, then the carve out in the Pittman statute should have applied and the tax should have been permitted. But the court held no. The tax is barred. The general exemption covers it. So all three of those cases, Supreme Court precedents each, really control the carve out argument. Now if we want to abstract away from the precedent and talk about why that's the case, adopting plaintiff's bundle of sticks analogy, which has some superficial appeal, I acknowledge that because we're all familiar with thinking of property rights as a bundle of sticks. Why isn't it a tax on one of the sticks in the bundle? Is this a tax on the right to convey property? We all agree the right to convey property is one of the sticks in the bundle. But as Judge Duncan's question suggested, this tax isn't imposed on the stick. You've got the right to convey your property from the time you purchase it to the time you dispose of it. This tax never hits. You could hold your property your entire lifetime. Tax would never hit. It is not a tax on the right to convey property. It's a tax triggered by the act of conveying property. It's an activity tax, not an existence tax. So it's a tax on the party that engages in the activity, but it is not a tax on the property underlying the transaction. I wanted to talk about the constitutional arguments a bit as well. I thought Mr. Springmeyer said something I found very interesting. He said he was aware of no example of a nondiscriminatory state tax being barred by an act of Congress. And I want to direct the court to a number of federal statutes and to two Supreme Court decisions, first of all. We cite both in our case. And first Agricultural National Bank of Berkshire County versus the Massachusetts Department of Revenue. Exxon versus Hunt involved the application of a preemption provision of CERCLA, the Federal Environmental Statute. And what the provision did was preempt certain kinds of state taxes that would fund a particular kind of compensation for environmental cleanup in the state. So what the federal statute did was preempt state taxation of private entities, petroleum and chemical companies, for certain kinds of taxes that relate to intrastate activities, chemical and oil spills in the state, in the state. Exxon versus Hunt, that federal statute affirmed. So that's example one. And I should say the thought that there's something special about state taxation was also addressed, albeit indirectly, in the Exxon case because the court observed the reason the preemption provision was included in the CERCLA statute. Congress' motivation was it thought these private companies might be overtaxed by the states. That's how the Supreme Court characterized the issue. Can the federal government preempt certain kinds of state taxation when Congress thinks the states might overtax certain kinds of private enterprises? Answer, yes. Second Supreme Court decision. First Agricultural National Bank of Berkshire County. Congress enacted a statute that prescribed the permitted ways states could tax national banks. National banks, private corporations, shareholder owned, operated for a profit, yet at the same time chartered by the federal government. Very similar to Fannie Mae and Freddie Mac. Now the statute worked somewhat differently. Instead of stating an all-purpose exemption and then conveying a limited carve out of the type we talked about earlier, the statute at issue in First Agricultural said, here are the kinds of taxes that the state can impose on national banks. All others precluded. So in each case, Congress took the universe of state taxation and divided it in two. Some taxes permitted, other taxes precluded. In First Ag, the State Department of Revenue of Massachusetts tried to- Are there limits to that authority? In other words, could Congress just pass superseding laws that say states may not tax the way they wish to tax? You know, that's not a question that's before the court. No, I understand. But I'm trying to find out the limits of your argument because it would seem you emphasize that these are private corporations being taxed and national banks is closer to the- there's a very strong national purpose and need for Congress to regulate that. And the fact that they created private corporations, they still were creations of Congress. I suppose in the Exxon case, it was interfering with the public policy of CERCLA. But the question, this is a serious question, is how far can Congress go and what authorities is it relying on when it limits state taxation? Well, I think- There must be some limit. Thank you, Judge Niemeyer. I think there are limits, but they're extrinsic to the Commerce Clause. They are extrinsic to the Commerce Clause. We explain in our brief that if Congress enacts legislation that addresses an activity with a substantial relationship to interstate commerce, that's good enough. I don't think there's any real dispute that we meet that We see that there is a concern about directing the states in how they legislate. There's an important difference here. And, Your Honor, I put the court's finger on it earlier when asking Mr. Springmeyer some questions. Congress didn't tell the states here, you must enact this kind of tax or you may not enact this kind of tax. That's up to the states. That's up to the states. And I think New York and Prince very clearly say Congress can't force the states to take affirmative actions to implement or administer a federal regulatory program. In the order that Congress said, we consider automobiles to be very important to the national economy and we want automobile dealerships to thrive. Here and after, no state may tax an automobile dealership. I think- Would you do that? I don't think that would violate the Commerce Clause, Your Honor. That would much more directly implicate the federalism concerns that Mr. Springmeyer has articulated than would the statute that issue here. They could do that? What I'm saying is these exemptions can stand regardless of whether Congress could do that. I have a hypothetical question. Whether in the national- Congress stated in the interest of the national economy, we find that car dealerships are important to the distribution of automobiles which are important to the national economy. Accordingly, no state may hereafter tax an automobile dealership. I think the precedents suggest that unless new doctrine were formulated, that statute would stand. You understand that that plays into Mr. Springmeyer's argument that the gist of which with respect to limitations on congressional power is, as I understand it, that there is no limiting principle. And he gave the Walmart example. And you're also having difficulty enunciating a limiting principle. We're not Walmart, Your Honor. And I think that when- What stands between you and Walmart? Three things. First, Congress created Fannie Mae and Freddie Mac. Second, it chartered them with an important mission Congress thought was important and that relates to interstate commerce. And third, Congress created a regulatory structure that directly and closely supervises the continuing activities of Fannie Mae and Freddie Mac. But none of those would seem to apply to car dealerships either. And you are willing to concede Congress's ability to exempt them from state taxation. Well, with great respect, Judge Duncan, what I said was I think that new doctrine would have to be formulated to differentiate between the car dealer example and Fannie Mae and Freddie Mac. And that's exactly the sort of new doctrine that a court might formulate from whole cloth. But where we are here is- Well, when I talk about new doctrine, we're talking about a constitution drafted some years ago. And it seems to me that if you were to agree that the federal government could abolish the tax on car dealerships, it could also say that all the national retail outlets are important to the national economy and the taxation, local taxation is burdening them. We're going to exempt them from property tax and sales tax. Now, what is your response to that? I mean- Well, Your Honor- I agree with that. And I bring it back to- And your argument doesn't allow any sensitivity for that. I disagree, Judge Niemeyer. I think I'm being as sensitive as anyone could be and certainly as sensitive as Chief Justice Marshall was in the second Commerce Clause case ever to come before the Supreme Court, Brown v. Maryland, where- But you're straying again from the line, even a blurry line, that the question asks for. What is your limiting principle? And I've said that the distinctions between Walmart and this case are the ones I enumerated. Congress created Fannie Mae and Freddie Mac. It didn't create Walmart. Congress chartered Fannie Mae and Freddie Mac to perform a specific mission and it limited their activities to that mission. This is unlike the Commodore Bridge case, the plaintiff's site, where the corporation was chartered by a state and allowed to do anything that the state law would permit corporations to do. So here we have corporations that serve an important federal interest that are limited to the continued pursuit of that important federal mission and that continue to be closely and strictly supervised by the federal government. We are not Walmart. We are not Walmart and a decision affirming the application of these exemptions would not authorize Congress to exempt Walmart or GM or anyone else. So I do, and I would point out that there are- So if we agree with you on that, how would we articulate the distinction? I would articulate the distinction by saying what the court is deciding today is whether Congress may protect by means of an exemption from all state and local taxation corporations it creates, that it limits to a federally important mission directly linked, inextricably intertwined with interstate commerce and over which the federal government maintains- Put it under the umbrella of the first agricultural bank. First agricultural, but- Those were national banks created by the federal government for a very important economic national purpose. Yes, I would, Your Honor, and I see my time is up. If I might finish my thought, I would say that there are authorities that suggest that Congress's power goes farther. Hunt, those were private corporations. Those were strictly local taxes. That exemption was affirmed by the Supreme Court. Lower courts in Deer Park, Conrail, SEPTA have all looked at the fact that Congress, under the Commerce Clause, exempt private entities from state and local taxation. Uniformly, the answer has been yes, just like it's been uniformly answered yes by every district court to examine the question in these cases and just as Chief Justice John Marshall held in Brown v. Maryland where he said, yes, the state sovereign power of taxation is sacred, sacred, his word. But he recognized in 1827 that that power may collide with Congress's power to regulate interstate commerce, and his answer was, when that happens, that which is not supreme must yield to that which is supreme. That resolves this case, Your Honors, and I appreciate the court's indulgence and attention. Thank you, Mr. Johnson. Mr. Erda? May it please the Court, Patrick Erda for the United States. As Mr. Johnson explained, the taxes here are not taxes on real property and the entities exemptions from all taxation. Where in the United States are you from? I am from the, well, originally from Indiana, Department of Justice Tax Division. You're welcome. Mr. Johnson seemed to be, well, I understood the appellee's argument to be that we didn't need to reach the federal instrumentality issue, but Mr. Johnson seemed to be relying on it to a considerable extent in his latter discussion. Sure, I actually think, and maybe I'm misinterpreting Mr. Johnson, but I think that he was making the same point that Judge Niemeyer did in his first set of questions, which is to illustrate the important economic and national interests served by Fannie Mae and Freddie Mac. I don't think that you need to reach the federal instrumentality status. Well, you do if you're going to make the distinction that he was urging on us with respect to car dealerships in Walmart. It devolved precisely to that. Well, I think that it does make a difference in that it makes it easier when the federal interest is clearly illustrated. And here that federal interest is clearly illustrated because just as Judge Niemeyer pointed out, this is serving the interstate market and securitized mortgage loans and making sure to foster that secondary mortgage market. But I don't think that that is actually necessary to reach the exact question of federal instrumentality. Mr. Johnson was, I believe, trying to illustrate that in this case it's open and shut. In terms of where to draw the line, I don't think that you have to have a federal instrumentality to draw this line. And I think that FHFA throughout has also maintained that position. It's the government's position that as long as this falls within the commerce power, that it substantially affects interstate commerce, then Congress does have the power to tailor reasonable methods to achieve its end. That's exactly what they did here. In terms of the car dealership or Walmart, that might be more of a political question. Could that ever happen? Would Congress ever enact it? Well, it's a slippery slope and it's probably not fruitful to take all the time. But it seems to me in a situation where almost everything affects commerce, I tried to use the dealership as something fairly local but does tangentially affect commerce. You could even get more local and the question is how far are we going to permit the federal government to say, erode basically I think the sovereignty of the states. There is over 200 years there has been a shift beginning with the Civil War amendments and so forth. And I appreciate the notion that we probably don't need to define it in this case. But I'm not sure I'm satisfied with the fact that anything that affects commerce can be regulated by eliminating the local tax. Well, I think that you're right, of course, it's a slippery slope. In this case, we don't need to reach the end result. And I think that there might be some limitations that we could think of. But what's important here is there's no question that this substantially affects interstate commerce. Now, turning to the second point, which is does this fit within the carve-out, as Mr. Johnson correctly stated, these are not direct taxes. These are transfer taxes, as the Supreme Court has pointed out in Wells Fargo. And so they do not come within the carve-out. It's not really distinguishable for Wells Fargo, is it? No. If there are no further questions, I'll relinquish the remainder of my time. Thank you, sir. Mr. Springbriar. I think what you've heard from the appellees is focused entirely on the attempt to now bring them back into federal instrumentality status, as opposed to identifying the basis on which Congress has the proper power to exempt a private corporation from a state tax. And that doesn't fly. That's a little too simplistic. It's a private corporation, but it was authorized, created by the federal government for a federal purpose, as were the national banks, right? That's true. But in First Agricultural, for example, that opinion assumes the federal instrumentality status as resolving the case. And then it goes to discussion of what is allowed to be taxed under the federal statute. I don't know if we need to use formulas. It seems to me we need to answer, can Congress create these corporations to carry on an important economic purpose for the nation? And if it can, and you've conceded it can, then to what extent can it regulate local taxation of those entities that it created for that purpose, including that it would make these corporations more efficient in furtherance of the national purpose? And if you apply any rational test, it seems to me it makes it a hard road for you to plow on that issue.  I would suggest that the abrogation of a state tax is such an important aspect of impinging on state sovereignty that rational... And I'd like to know where the line is, but I'm not sure we have to decide it. That may be the Supreme Court to decide, but the question is along the spectrum. It's a slippery slope, but maybe we have a few footholds here. Well, maybe, but is the foothold that any penny or dollar which reduces the profitability of Fannie and Freddie within the purview of Congress to eliminate? Why not? If Congress decides it and says that we believe that pennies add up to nickels and nickels add up to dollars, it's their judgment, isn't it? Well, in the first place, they didn't say that here. There is no jurisdictional statement about... No, I understand that. I understand that. And in the second place, Your Honor, that is exactly the but-for causation problem that was eliminated by Lopez, saying it can't be the case that anything becomes interstate commerce or the commerce clause is everything, which... Sure, you can make those statements, but the question is in creating Fannie Mae and Freddie Mac, can Congress exempt them from all local taxation? And you seem to think they could. And then the question is, well, they carved out property tax. What's wrong with that? That's relinquishing to the states a realm of taxation that provides income to the states and yet may not be too burdensome to the mission of Fannie Mae and Freddie Mac. As a matter of fact, I was trying to figure out how Fannie Mae and Freddie Mac, in this case, was involved in transferring property. The record shows that they were actually transferring property. And I suppose maybe they took them by deed in lieu of foreclosure or... Yes, we're talking about foreclosed properties here, Your Honor. Foreclosed properties, and they're transferring them out. They resell the property after they foreclose. That's exactly right. The idea that Congress can create them in the first place, I absolutely agree with. Congress has the power to do that. But then Congress converted them into private corporations, and it should be held to the double-edged sword of that. It got rid of... It doesn't take away Congress's power. It's just a vehicle by which they want to carry out their mission. But find it better to have private investment in these companies that provide capital. They don't need tax dollars. The stock provides capital. They securitize these mortgages and resell them. That's right. I guess AIG insures them. And the market collapses. Well, indeed, and that's why we came to be here. There was no problem before 2005. I urge that there's more in privatizing than just saying now they can be someone else's problem, but they still get the benefit of our... They could just withdraw the authorization of those corporations to go away. As a matter of fact, there's a political movement that tries to eliminate them. There is. I'm not sure how that interplay happens when their stockholders are the public, Your Honor. Well, because they're created by Congress. Congress creates it. But would Congress have to pay share value to all those shareholders? I don't know what the mechanism is. Well, I don't know either. Okay. I see my time is up. Thank you. We'll come down and greet counsel and then go into the next case. Thank you.
judges: William B. Traxler, Jr., Paul V. Niemeyer, Allyson K. Duncan